In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-18-00391-CR
_____

MICHAEL ALAN WEBSTER SR., Appellant

V.

THE STATE OF TEXAS, Appellee

_____

On Appeal from the 359th District Court
Montgomery County, Texas
Trial Cause No. 17-12-14725-CR

_____

**MEMORANDUM OPINION**

A jury convicted Michael Alan Webster Sr.[1] of recklessly injuring his three-week-old son, Michael Alan Webster Jr. and assessed a sentence of confinement in prison for life.[2] Following the trial, Webster appealed. He filed a brief in which he

---

[1]The record shows that Michael Alan Webster Sr. is also known as Michael Webster and Michael Alan Webster.

[2]Tex. Penal Code Ann. § 22.04(a)(1), (b)(2).

1

raises four issues for our review. In Webster's first two issues, he complains the evidence in his trial fails to prove, beyond reasonable doubt, that he was reckless in causing his son's death. In his third issue, Webster argues the trial court erred by allowing the State to introduce the lyrics from two songs, *Stan* and *Just the Two of Us*, written by Eminem, into the evidence in the trial. The evidence shows Webster referred to the songs in an email he sent to Michael's mother several days before Michael died. In his fourth issue, Webster argues the trial court, in the guilt-innocence phase of his trial, abused its discretion by allowing a paramedic to express an opinion stating it was not safe to leave an infant in a van under circumstances like those on the day Michael died. For the reasons below, we conclude Webster's issues lack merit. We will affirm.

Background

On appeal, we review a defendant's arguments suggesting the evidence does not support the jury's verdict in the light that favors the verdict the jury reached in the trial.[3] The evidence before the jury shows that Michael was healthy when he was born on July 16, 2014. Webster, Michael's father, and Valerie Colom, Michael's

---

[3]*See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (explaining "the reviewing court is required to defer to the jury's credibility and weight determinations" when reviewing a claim that argues the evidence fails to support the jury's verdict).

mother, took Michael home with them about two days after he was born. A few days later, Valerie called her father. She asked him to come get her because she felt she could not safely remain with Webster in his home. Valerie, who testified in Webster's trial, explained she left Webster because he was using drugs. Valerie also testified that when she left, Webster had been awake for three days because he was using methamphetamine (meth).

About two weeks after Valerie, with Michael, moved to her parents' home, Webster drove a cargo van into the driveway of the home. Valerie, who was holding Michael in her arms, came outside. Webster left the van, took Michael from Valerie, and left. When Webster asked Valerie to join him, she refused.

Over the next eight days, Webster and Michael lived out of his van. Webster lived out of the van because his landlord had evicted him from his home, the home Webster took Michael to after he was born. During this eight-day period they lived in the van, Webster was around several individuals, including some of his relatives. These relatives testified during Webster's trial.

Generally, the testimony of Webster's relatives shows they thought Webster was in an agitated state when he was around his relatives at his cousin's home. Some of the State's other evidence provides further support for the evidence showing Webster was in an agitated state while he had Michael in his care. For example, on

3

August 4, Webster posted a photo of himself on a social media website complaining he didn't have a place to sleep. Webster placed a post on the same website stating "[i]t's about all you pieces of shit that let a-17-day old baby sleep on the street last night[.]" In the post, he went on to explain that "he [would] never do that again. Whatever it takes[.]"

Over these eight days, Webster spent part of his time at his cousin, Patricia Finnerty's, home. At times, Webster allowed Patricia and Patricia's daughter, Magan, to babysit Michael after leaving him at Patricia's home. In early August 2014, Valerie learned Webster possibly left Michael with Patricia at her home. Valerie obtained a writ of habeas corpus, in which a court ordered that Webster surrender Michael to the police.

On August 7, 2014, Sergeant Willingham, a deputy constable, went to Patricia's home to serve the writ. But when he arrived, Webster and Michael were not there. Sergeant Willingham spoke to Webster, by phone, after trying to serve Webster that day. Webster told the officer he would not surrender Michael to the police that day because "he couldn't get a ride." Webster promised to take Michael to the police the next day.

After talking to Sergeant Willingham on the phone, Webster went to Patricia's home. During the trial, Patricia testified that on August 7, the last day Webster came

4

to her home, he appeared to be agitated and tired. Patricia and Magan both asked Webster whether they could babysit Michael so he could sleep. Webster refused. Webster also asked Patricia for a loan. She refused. When Webster left, he told Patricia he was taking Michael back to Valerie because they had no place to live.

Around 7:30 a.m. on the morning of August 8, Angela (Patricia's other daughter) left Patricia's home for work. While leaving the driveway, Angela noticed Webster's van blocking the driveway to Patricia's home. When Angela approached the van, she noticed Webster was asleep inside. Angela did not, however, notice whether Michael was also in the cabin of the van. Angela tried to wake Webster by tapping on the window of the van. Webster did not wake up, but, according to Angela, he was sweating when she saw him sleeping in the driver's seat of the van.

Shortly after Angela left Patricia's house, Patricia woke up and heard someone pounding on her bedroom door. Upon opening the door, Webster stated something was wrong with Michael. Michael was still in the van. Webster returned to the van, got Michael, and carried him inside Patricia's home. When Patricia saw Michael on the morning of August 8, she realized he needed help. She called 911.

The EMS report shows that Patricia placed her call to 911 at 8:17 a.m. According to the paramedic's report, Patricia told the 911 operator Michael was "not breathing[.]" Kevin O'Connell accompanied other emergency responders to

5

Patricia's home. O'Connell is the paramedic who went to Patricia's home on August 8 in response to her call for help. According to O'Connell's report, family members at Patricia's home told him "there was a 30-45 minute time lapse from when father awoke until 911 was called." Shortly after he got to the scene, O'Connell determined that additional medical care would not help Michael and he instructed the member of the household performing CPR on Michael to stop CPR.

Dr. Sparks Veasey, a forensic pathologist, conducted an autopsy on Michael's body. Veasey's report contains the following five findings:

**FINDINGS:**

**I. Complications of unsafe sleeping environment.**
   **A. Within car seat in truck not air conditioned for a period of time, subsequent to running out of gas.**
   **B. Covered, according to historical information, by fleece type blanket.**
   **C. Report of feeling "very hot" at time of discovery.**

**II. Presence of trace of methamphetamine within blood (see attached toxicology reports).**

**III. Atypical livor.**

**IV. Petechiae over epicardial surface of heart, thymus, pleural surfaces of lungs, and internal ribcage bilaterally.**

**V. Foam exuding from nose at time of autopsy.**

Dr. Veasey's report also contains the following opinions, which he based on the results of Michael's autopsy:

6

**OPINION:**

**This 3 week old male infant, Michael Allen Webster, Jr., died of complications of unsafe sleeping environment. The presence of methamphetamine within the postmortem blood contributed to death.**
**The manner of death is accident.**
**CAUSE OF DEATH: Complications of unsafe sleeping environment.**
**OTHER SIGNIFICANT CONTRIBUTING DISORDER: Presence of methamphetamine (trace) within postmortem blood.**

**MANNER OF DEATH: Accident.**

In July 2016, a Montgomery County grand jury indicted Webster, charging him with recklessly injuring Michael by failing to provide him a safe sleeping environment.[4] In December 2017, another grand jury reindicted Webster, charging him with recklessly injuring Michael by failing to provide Michael a safe sleeping environment and by failing to prevent Michael from being exposed to meth.[5]

Webster's case was tried before a jury in September 2018. Twenty-nine witnesses testified in the trial. The trial court also admitted over 150 exhibits during

---

[4]Tex. Penal Code Ann. § 22.04(a)(1), (b)(2).
[5]In Webster's trial, the State dropped all but one of the enhancement counts contained in Webster's indictment. But the trial court submitted one of the enhancement counts to the jury. On that count, the jury found Webster had previously been convicted of a felony for delivering a controlled substance. Based on the enhancement count and its verdict finding Webster guilty of recklessly injuring a child, the punishment range applicable to Webster increased from the range available for second-degree felonies to the range that applies to first-degree felonies, which is five years in prison to life. *Id.* §§ 12.32(a), 12.42(b), 22.04(e).

the trial. The witnesses included several experts, many with medical degrees. Several physicians holding board certifications in fields that include pathology, neuropathology, toxicology, and pharmacology testified for the State. Webster called physicians in his defense and contested the State's theory on how Michael died. Webster's experts hold board certifications in various fields, including pediatric and developmental pathology, neuropathology, and toxicology.

In addition to expert testimony by various witnesses who hold advanced degrees, the jury heard testimony describing the ambient temperatures experienced in Montgomery County, Texas, in the month of August 2014. Additionally, the jury heard lay opinions describing how hot it was on the day Michael died. O'Connell, the paramedic sent to Patricia's home, testified that in August, in Montgomery County, it is "[r]eally hot." A weather report, admitted into evidence in the trial, contains hourly weather readings from a major airport located near Patricia's home. The report shows the ambient air temperatures on August 7 between 11:00 p.m. to August 8 and 8:00 a.m. ranging from 80 degrees Fahrenheit to around 82 degrees Fahrenheit. The relative humidity readings in the same period based on the weather report shows the humidity levels during that same time of between 82 to 85 percent.

During the trial, several witnesses testified they felt it was unsafe to leave a newborn infant for long in the summer in a car seat in an unairconditioned vehicle

in Montgomery County. While investigating Michael's death, the police asked Webster why he decided to sleep in the van overnight. Webster told police he knocked on Patricia's door, but decided to sleep in the van when no one answered. Magan, Patricia's youngest teenaged daughter, and Christian Arrega, Magan's boyfriend, who were sleeping in Patricia's living room, disputed Webster's claim that he knocked on the door to Patricia's home on the evening of August 7. According to Magan and Christian, they never heard anyone knocking on the door that night.

During the investigation on August 8, Webster gave the police a specimen of his blood. When later tested at a lab, the lab determined Webster's specimen contained meth at a detectable level. According to witnesses called by the State, the level of meth found in the specimen showed that Webster had used meth the day Michael died. Yet the lab technician acknowledged the level of meth she found in the sample was low. The lab technician described the level as between the limit of detection and the limit of quantification. The State's expert, Dr. Kathryn Pinneri, who reviewed the lab's test, described the level of meth in the specimen as a trace. Pinneri's testimony reflects she is a board-certified forensic pathologist.

Generally speaking, the parties' experts provided the jury with conflicting opinions about the cause of Michael's death. Dr. Veasey, who performed Michael's

autopsy, explained that he relied on more than just his autopsy in forming his opinions. In addition to performing the autopsy, Dr. Veasey's testimony reflects that he reviewed Michael's medical records and interviewed Webster, seeking to learn from him what happened in the period leading up to Michael's death. Based on his review of Michaels' medical records, Dr. Veasey testified Michael was a healthy infant when he was born. As to his opinion about the cause of Michael's death, Dr. Veasey testified Michael died of, "complications of unsafe sleeping environment" with meth as a contributing factor. Elaborating on how he reached his conclusion, Dr. Veasey explained that infants, because they are not yet very developed, cannot tolerate heat like older children and adults. Dr. Veasey explained that in his opinion, the temperature in the van rose after the van ran out of gas and lost its air conditioning. Webster complicated the conditions inside the van further by covering Michael with a blanket even though Michael was not yet old enough to have been able to move the blanket away from his face. And Dr. Veasey testified that Michael, based on the results of his lab tests, had been exposed to meth. According to Dr. Veasey, meth is a substance that raises a person's body temperature, heartbeat, and blood pressure.

On the other hand, Webster's experts testified they thought Michel died from a congenital vascular malformation in his brain, a condition they stated as one that

can be lethal. The State's medical experts disagreed with the diagnosis Webster's experts testified to in the trial, explaining that, based on the information they reviewed, including tissue taken from Michael's brain in his autopsy, Michael did not have a vascular defect of the brain. And even Webster's experts acknowledged during their testimony that an individual can live a normal life even with a vascular malformation like the one they thought Michael had in his brain.

In Webster's first two issues, his main argument suggests the evidence admitted during his trial does not support the jury's finding that his conduct was reckless, as defined in the charge. In its charge, the trial court instructed the jury on the meaning of *recklessness*, explaining:

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

As to *causation*, the charge the trial court provided the jury instructs:

> A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

11

In final argument, Webster's attorney argued the State failed to prove, beyond reasonable doubt, that the level of meth in Michael's body caused his death. He also argued the State's medical experts did not tie Michael's death to sleeping inside the van, suggesting the testimony of the experts merely suggested a possible relationship between the heat in the van and Michael's death. In closing argument, the prosecutor argued that Webster's conduct, over a period of around eight days before Michael's death, showed that Webster had been reckless in protecting Michael and that his recklessness led to Michael's death. Additionally, the prosecutor suggested that Webster made a conscious choice when he made Michael stay with him in the van overnight even though he knew it would not be safe given that the van was running out of gas and how hot it was outside the van.

After deliberating its verdict, the jury found Webster "Guilty of Injury to a Child, as charged in the Indictment." In the punishment phase of the trial that followed, the jury decided that Webster should be sentenced to prison for life.[6]

---

[6] Based on the evidence showing Webster had a prior felony conviction, the trial court instructed the jury that it could consider a punishment ranging from five to ninety-nine years or life in prison.

Sufficiency of the Evidence

*Standard of Review*

In appeals, we review the evidence the jury considered in reaching its verdict in the light that favors the jury's verdict.[7] In our review, we must decide whether the evidence, when viewed in the light favoring the verdict, is such that a reasonable jury could have found the defendant committed each of the elements of the crime the State charged him with committing based on evidence that proved the defendant's guilt beyond reasonable doubt.[8] In trials, it's up to the jury to decide what witnesses are credible and to decide how much weight to give their testimony.[9] In the appeal, we must defer to the responsibility the jury has in the first instance to resolve the conflicts in the testimony, to weigh the evidence the trial court admits into evidence in the trial, and to draw inferences from the basic facts to the ultimate facts the jury must decide to resolve the issue in dispute in the trial.[10] When witnesses testify to facts or opinions that are in conflict with the testimony of others, we presume the jury resolved the conflict in a manner favoring the verdict the jury

---

[7] *Brooks*, 323 S.W.3d at 902 n.19 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

[8] *Id*.

[9] *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981).

[10] *Hooper*, 214 S.W.3d at 13.

ultimately reached.[11] We defer to the jury's resolution of the conflicts if the resolution the jury achieved was a reasonable one from the evidence admitted during the defendant's trial.[12] In deciding whether the manner the jury resolved the case was reasonable, we evaluate the combined and cumulative force of the evidence the trial court admitted into evidence in the defendant's trial.[13]

While appellate courts must be mindful of the jury's role in resolving disputes, a jury may not arrive at its verdict on "mere speculation or factually unsupported inferences or presumptions."[14] Yet proving a fact does not necessarily require the State to produce direct evidence of the defendant's guilt.[15] Often, as is the case here, circumstantial evidence is just as probative as direct evidence in establishing a fact of consequence in the dispute.[16] Stated another way, the evidence need not point directly to the defendant's guilt so long as the cumulative force of the incriminating evidence allowed the jury to reasonably find the defendant committed each element of the crime the indictment alleges the defendant committed.[17] Even though the

---

[11] *Brooks*, 323 S.W.3d at 899 n.13; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).
[12] *Id.*
[13] *Clayton*, 235 S.W.3d at 778.
[14] *Hooper*, 214 S.W.3d at 15-16.
[15] *Id.*
[16] *Jenkins v. State,* 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).
[17] *Hooper,* 214 S.W.3d at 13.

inferences available from the facts may allow "two permissible views of the evidence, the [jury's] choice between them cannot be clearly erroneous."[18]

In a case where the State charges the defendant with recklessly injuring a child, the State must prove the defendant assumed care, custody, or control of a child, and that he recklessly, by omission, caused the child a serious bodily injury.[19] Under the Penal Code, the term *serious bodily injury* means a "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."[20]

The crime of injuring a child is a result-oriented offense.[21] Thus, the defendant's mental state, recklessness, does not relate to the defendant's specific conduct but instead looks to the result, that is the consequences, of his conduct.[22] To prove the defendant acted recklessly, the evidence before the jury must allow it to reasonably infer the defendant acted with the required *mens rea*.[23] Under the Penal Code:

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and

---

[18] *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006).
[19] Tex. Penal Code Ann. § 22.04(a)(1), (b)(2).
[20] *Id.* § 1.07(46).
[21] *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).
[22] *Id.*
[23] *Id.*

15

unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint."[24]

To prove criminal recklessness, the State must prove the defendant disregarded a known, substantial, and unjustifiable risk. In contrasting recklessness with criminally negligent conduct, the Court of Criminal Appeals explained: "Criminal negligence depends upon a morally blameworthy failure to appreciate a substantial and unjustifiable risk while recklessness depends upon a more serious moral blameworthiness—the actual disregard of a known substantial and unjustifiable risk."[25] Thus, the State must prove more than the fact the defendant lacked foresight, acted stupidly, irresponsibly, thoughtlessly, or that he was careless.[26] Instead, to establish recklessness, the State must prove the defendant knew of the risk he created by his conduct and ignored it.[27] To decide whether the evidence established recklessness, we examine the evidence to see whether the State proved the defendant knew of the magnitude of the risk but disregarded it.[28] In an appeal challenging a finding of recklessness, we look at the evidence of the risk the

---

[24] Tex. Penal Code Ann. § 6.03(c).
[25] *Williams*, 235 S.W.3d at 751.
[26] *Id.* (cleaned up).
[27] *Id.*
[28] *Id.* at 752-53.

16

defendant faced from the defendant's standpoint and without the benefit of hindsight.[29]

*Analysis-Sufficiency of the Evidence*

In his first issue, Webster argues the State failed to prove he was reckless. According to Webster, his conduct should be evaluated by looking at the circumstances as he discovered them when he woke up in his van on August 8. In his second issue, Webster argues the evidence does not support the jury's finding that he acted recklessly when he failed to prevent Michael from being exposed to meth.

In its charge, the trial court asked the jury to decide whether Webster caused Michael's death by recklessly failing to provide him a safe sleeping environment *or* by failing to prevent him from being exposed to meth. (emphasis added).[30] In other words, the court submitted the issue in a disjunctive form.[31] In Webster's brief, he relies on the disjunctive language, suggesting the State's evidence failed to establish that either omission, on its own, caused Michael's death. While we acknowledge the trial court provided the jury with a disjunctive charge, Webster's indictment used

---

[29] *Id.* at 753.
[30] Emphasis added.
[31] As a matter of grammar, "expressing a choice between two mutually exclusive possibilities, for example *or* in *she asked if he was going or staying.*" *See* NEW OXFORD AMERICAN DICTIONARY 499 (3d ed. 2010).

the conjunctive *and*, not the disjunctive conjunction *or*. Thus, based on the language in Webster's indictment, the State was entitled to establish that Michael's death resulted from one or more of the alleged omissions and was not required to prove that each omission, in isolation, caused Michael's death.

When a defendant appeals and claims the evidence in his trial does not support the jury's finding of guilt, we assume when reviewing the evidence upon appeal that the trial court provided the jury with a hypothetically correct charge.[32] Under Texas law, a hypothetically correct charge is a charge that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."[33] Under a hypothetically correct charge, the charge must include the statutory elements of the offense as the statute is modified by the charging instrument.[34]

Webster's indictment alleges Webster recklessly caused Michael to suffer a serious bodily injury by failing to provide him with a safe sleeping environment *and* by failing to prevent Michael from being exposed to meth. At trial, the State's theory of the case, as the prosecutor argued, was that Webster's omissions, acting together,

[32] *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).
[33] *See Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012).
[34] *Id.*

18

caused Michael's death. Given the indictment, a hypothetically correct charge required the trial court to charge the jury in the conjunctive form, that is use the word *and*, rather than by using the disjunctive form, in this charge the word *or*. Thus, we review the evidence to decide whether the jury could have reasonably concluded from it that Webster's alleged omissions, either alone or in combination, caused Michael's death.[35] We do so because we "measure the sufficiency of the evidence against the elements of the offense as they are defined in the hypothetically correct jury charge."[36]

The jury's finding that Webster acted recklessly is based mostly on circumstantial evidence. But while circumstantial, the evidence shows Webster placed Michael in the van even though he knew he needed a working air conditioner to keep the van cool given the weather conditions that existed in the period relevant to Michael's death. The evidence allowed the jury to infer that Webster knew the van would lose its air conditioner once the van ran out of gas. The jury also heard testimony that it's common knowledge one cannot leave an infant in a vehicle in Montgomery County in the summer for any extended period of time without an air conditioner that works. Yet, the jury could infer from the testimony that Webster

---

[35] *Id*.

[36] *Ramjattansingh v. State*, 548 S.W.3d 540, 552 (Tex. Crim. App. 2018).

19

knew he was running out of gas before he went to Patricia's home on August 7. He left the van running to keep the air conditioner going even though he knew the van did not have enough gas to run all night. Under the circumstances, the jury could reasonably infer Webster knew he needed to keep the air conditioner running given the heat outside the van that night. The jury could reasonably infer that Webster knew he did not have enough gas in the van to keep it running all night based on Patricia's testimony that he tried to get her to loan him money so he could buy more gas. During the investigation, Webster told police that he took the van to Patricia's house that night because he knew he was running out of gas. The circumstances also allowed the jury to infer that Webster knew how hot and humid the conditions were outside the van. That's because Webster was with Michael before and after the van ran out of gas. Yet, knowing the van would not run all night, Webster covered Michael with a blanket and then claims he went to sleep. Angela's testimony, which shows she noticed Webster sweating in the van when she was on her way to work, offers additional evidence to support the jury's conclusion that it would have been too hot to keep an infant inside a van that no longer had a working air conditioner.

Other circumstantial evidence supports the jury's inference that Webster was aware that he could not keep Michael safe while he was with him in a period relevant to Michael's death. For example, exhibits admitted into evidence show that Webster

20

posted messages on a social media site suggesting he was upset with Valerie because she and her father had engaged in conduct requiring him to sleep with Michael "on the street[,]" a situation he said should not have to happen "again." Within hours of Michael's death, Webster left Valerie's father a voicemail stating: "I place all of this blame on you for what happened to my son because we wouldn't have been sleeping in the van if it wasn't for you." From the evidence, the jury could have inferred that Webster knew he did not have the resources to provide Michael with a safe place to sleep based on the circumstantial evidence showing that he knew how hot it was and that his van would soon run out of gas.

To be sure, the evidence tracing Michael's exposure to meth to his death is weaker than the evidence showing that Michael died from being exposed to excessive heat. Yet there is evidence that Michael's exposure to meth was a contributing factor that explains why Michael died when he did. Blood specimens, taken from Michael and Webster during the investigation, were both positive for meth. Other testimony shows Webster was known to use meth. Finally, the only witnesses around Michael in the period surrounding his death denied ever using meth while Michael was around.

Expert testimony connected Michael's exposure to meth as a factor that contributed to Michael's inability to control his temperature so that he could cool

21

himself off. A forensic toxicologist, called by the State, testified that Webster probably used meth in a twenty-four-hour period before Michael died. No other testimony shows that anyone around Michael exposed him to meth. The jury also heard witnesses testify in the trial that meth is a stimulant, which tends to raise a person's body temperature, heart rate, and blood pressure. Thus, the jury could have considered Michael's exposure to meth, even though slight, to have been an aggravating factor explaining why he could not regulate his body temperature and cool himself off.

The evidence also allowed the jury to infer that Webster exposed Michael to risks that were unjustifiable. Patricia's daughter, Magan, testified she offered to watch Michael and told Webster he needed to get some sleep. Webster declined. Yet, had he agreed, he could have left Michael with adults in an environment that would have been safer than the one he chose instead. Webster also could have, but did not, surrender Michael to the police, a decision that would have avoided the need to keep Michael with him in the van.

Given the evidence that shows Webster knew he was running out of gas, we conclude the record contains sufficient evidence to support the jury's finding that Webster acted recklessly by knowingly exposing Michael to an unjustifiable risk by

requiring him to remain in the van with Webster overnight given the weather conditions that existed outside the van in the period relevant to Michael's death.

Liberally construed, Webster's brief also seems to suggest the State failed to link Wester's recklessness causing Michael's death. As to causation, both of the State's forensic pathologists attributed Michael's death to "complications of unsafe sleeping environment." While Webster's expert witnesses proposed an alternative theory explaining Michael's death—claiming Michael had a congenital malformation of the vessels in his brain—the State's experts disagreed. As the factfinder, the jury was free to resolve the conflicts in the evidence and accept the opinions offered by the pathologists that testified for the State.[37] Because Webster's first two issues lack merit, they are overruled.

## Evidentiary Rulings

### *The Admission of the Lyrics*

In issue three, Webster complains the trial court abused its discretion by admitting the lyrics from the two songs Webster mentioned in a post that he placed on his social media account. The evidence from the trial shows that the night Webster

---

[37] *See* Tex. Penal Code Ann. § 6.04(a) ("A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.").

took Michael from Valerie, he posted a message on his social media account stating: "Last night I was feeling like Marshall Mathers [a/k/a Eminem] towards Kim [Mather's girlfriend] in Eminem's *Stan* and *Just the Two of Us*." While Webster's posted message does not specifically mention the lyrics in either song, he does not dispute the authenticity of the lyrics the State introduced to prove what the lyrics say. The lyrics of the songs reflect they are about a father, in possession of his child, who is angry with the child's mother after he and the mother had difficulty with each other in their relationship.

In Webster's third issue, Webster contends in three separate arguments that the trial court should have sustained his objections to the State's proffer of the lyrics of the two songs. First, Webster argues the lyrics were inadmissible hearsay because he did not write the songs. Second, Webster argues the lyrics were irrelevant to the issues material to deciding whether he recklessly injured a child. Third, Webster suggests that, if relevant, the ruling to admit the lyrics was more prejudicial than probative on the issues the trial court asked the jury to decide in his trial.

Relying on Rule 801(e)(2) of the Rules of Evidence, the State argues the lyrics were admissible as statements that Webster adopted based on what he said about the songs in the posts he placed on his social media account. When a defendant complains about an evidentiary ruling in a trial, we review the trial court's ruling by

using an abuse-of-discretion standard.[38] In deciding whether error occurred, the defendant must show the ruling admitting the evidence "lies outside the zone of reasonable disagreement."[39] Before deciding whether the trial court properly admitted the lyrics, we address Webster's argument that the lyrics of the songs were not relevant to the issues that were relevant in his trial. Then, we review his argument claiming the lyrics, if relevant, were more prejudicial than probative on the issues in his trial.

As to relevance, evidence is relevant if it tends to make a fact more or less probable and the fact is one that is of consequence in the trial.[40] "Evidence need not by itself prove or disprove a particular fact to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence."[41] However, even relevant evidence must be excluded when the danger that the evidence is unfairly prejudicial substantially outweighs its probative value given the circumstances that are relevant in the trial.[42]

---

[38]*See Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018) (explaining that appellate courts review rulings admitting evidence under an abuse of discretion standard).

[39] *Id.*

[40] Tex. R. Evid. 401.

[41] *Stewart v. State*, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004).

[42] Tex. R. Evid. 403.

Generally, courts balance the following four, non-exclusive factors in deciding whether evidence is more prejudicial than probative: "(1) how probative the evidence is[;] (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence."[43] In Webster's case, the State needed to prove that Webster acted recklessly and caused Michael to suffer a serious injury by failing to provide him with a safe sleeping environment and by failing to prevent him from being exposed to meth. Thus, the State needed to produce direct or circumstantial evidence to prove Webster acted recklessly. That required the State to produce direct or circumstantial evidence from which a jury could conclude that Webster was "aware of but consciously disregard[ed] a substantial and unjustifiable risk that the circumstances exist or the result [would] occur."

Here, the State sought to prove Webster acted recklessly by establishing he acted unreasonably under the circumstances by keeping Michael with him overnight in a van running out of gas given the weather conditions that existed that day. In posts Webster created on his social media account, Webster explained he felt "like Marshall Mathers [(Eminem)]" felt towards Mather's girlfriend based on the songs

---

[43] *See Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019).

he identified by song title in his post. So the question is whether the lyrics of the songs *Stan* and *Just the Two of Us* are relevant to a fact of consequence in Webster's trial. In its brief, the State argues the songs' lyrics were relevant because they show Webster acted irresponsibly in refusing to surrender Michael to his cousin, to the police, or to return him to Valerie so that he could make Michael live with him in a van where he knew it was unsafe to keep an infant given the weather conditions he faced on the last day of Michael's life.

In general, the lyrics of the songs Webster referred to in his post describe a father who is angry with a female significant to the father in his life. The protagonist in the song places the blame for his anger on his failed relationship with the female figure referred to in the song. The State suggests the lyrics were relevant to proving Webster's motive and that his motives led to conduct that was reckless. Since Webster's motive was at issue in the trial, we cannot say the State's argument that the songs' lyrics had some relevance to showing why Webster made the decision to keep Michael with him rather than surrendering him to others had no relevance to the evidence relevant to proving the reasons Webster made the decisions that he did in the period relevant to Michael's death. For that reason, we conclude the trial court's ruling is one falling within the zone of reasonable disagreement. Stated

27

another way, we cannot say the trial court abused its discretion by finding the lyrics relevant to a fact of consequence in Webster's trial.

We reach the same conclusion regarding Webster's argument claiming the songs' lyrics were more prejudicial than probative to a fact of consequence in his trial. In the trial, the State argued that Webster took Michael from Valerie to punish her for leaving him even though he knew he did not have the resources to provide Michael with a safe place to live. The State did not require much time to establish what the lyrics of the songs say. And while it's true the lyrics reference the protagonist's feelings of violence toward the female figure in the songs, the lyrics nonetheless had some relevance to explain why Webster kept Michael with him even though he could have surrendered him to someone better equipped to care for an infant who was less than a month old. For these reasons, we cannot say the trial court's decision to admit the lyrics was *unduly* prejudicial to Webster's rights to a fair trial since Webster, in his social media posts, directed those who were reading his posts to look to the songs he referenced to understand him.[44]

In his third and the remaining part of his issue three argument, Webster suggests the trial court should have excluded the lyrics from the evidence because

---

[44] *See Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) (explaining that Rule 403 applies "only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value").

the lyrics were inadmissible hearsay. Hearsay is defined as an out-of-court statement that is offered by a party to prove the truth of the matter the statement asserts.[45] Absent some exception to the rule excluding evidence that qualifies as hearsay, courts must exclude the evidence if offered to prove the truth of a matter the party offering the evidence contends it proved in the trial.[46] In Webster's case, the State argued when it was in the trial court that Webster adopted the lyrics of the songs given the statements he made referring to the song titles in his social media posts.[47]

Under the Rules of Evidence, an exception to the rule excluding hearsay exists for the statement made by another party outside court if the party against whom the statement is being offered adopted the truth of the statement as his own.[48] Webster's social media posts allowed the trial court to infer that Webster adopted the songs' lyrics when he stated his readers could decide what he was feeling based on the songs Webster referred to in his posts. In one of the posts, Webster explained "[e]verything is music to me, every action, every voice, every relationship, every scenario, EVERYTHING."

---

[45] Tex. R. Evid. 801(d).

[46] *Id.* 802.

[47] *Id.* 801(e)(2). We note that Webster has not argued the trial court erred by admitting copies of the internet pages showing what he posted on his account.

[48] *Id.* 801(e)(2)(A), (B).

We cannot say the trial court abused its discretion by applying the adopted statement exception to lyrics of the songs at issue in Webster's appeal. The trial court could have reasonably inferred that Webster was referring to the lyrics based on the language he used in his posts, not just the songs' titles.

Having fully considered the three arguments Webster relies on to support his argument claiming the lyrics should have been excluded as hearsay, we overrule Webster's third issue.

*Lay Opinion about Sleep Environment*

In issue four, Webster argues the trial court abused its discretion by allowing Kevin O'Connell, the paramedic who responded to the call Patricia made to 911, to express his opinion about whether it was safe to place an infant in a van given weather conditions like those in Webster's case. The record shows that, during the trial, the prosecutor asked O'Connell whether "as a person who lives in Texas in August, would you put a newborn baby in a car seat not strapped in under multiple blankets . . . in Texas August heat in a van with no gas and no A/C, would you feel like that was safe?" Webster objected to the question, arguing the question assumed facts not in evidence and was speculative. The trial court overruled the objection and stated that O'Connell could "answer in your lay opinion." O'Connell responded: "No, I would not."

Assuming without deciding that Webster did not need to object to O'Connell testifying to an opinion as a lay witness, the Texas Rules of Evidence explain when lay and expert testimony is admissible in a trial.[49] Rule 701, the rule authorizing lay witnesses to express opinions, provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception; and
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue.[50]

At trial, O'Connell testified without objection that the heat in Texas in August is "terrible[,]" explaining he meant the weather that month was "[r]eally hot." While O'Connell agreed he was not formally trained on what sleeping environments for infants were safe, the evidence shows he was at the scene in the area where Michael died in a period that the trial court could have considered to be relevant to his death. Thus, as the gatekeeper, the trial court could have inferred that O'Connell was in a position to know what the weather conditions were like in the area of town where Michael died. O'Connell's opinion—that he thought it was unsafe to leave a child in a van for long under conditions like those experienced in Montgomery County in August—represented a lay opinion, given that the opinion hinged on O'Connell's

---

[49] *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002).
[50] Tex. R. Evid. 701.

31

personal knowledge about the area of town and in a period relevant to Michael's death. Thus, we cannot say the trial court abused its discretion by admitting O'Connell's lay opinion testimony about whether he thought it was safe to leave a child in a van without air conditioning under the weather conditions that existed at that time.[51] We overrule Webster's fourth issue.

Conclusion

We conclude the evidence before the jury allowed the jury, acting reasonably, to believe that Webster recklessly injured Michael, a child. We further conclude the trial court did not abuse its discretion by overruling Webster's objections to the evidence he complains about in his third and fourth issues. For these reasons, the trial court's judgment is

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on August 17, 2020
Opinion Delivered December 16, 2020
Do Not Publish

Before McKeithen, C.J., Kreger and Horton, JJ.

---

[51] *See Cameron v. State*, 241 S.W.3d 15, 19 (Tex. 2007); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990).